## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

KEJUANTAÉ ADRIEN BUTLER,      )
                                     )
          **Petitioner,**        )
                                     )
**v.**                                )       **Case No. 21-CV-0561-CVE-JFJ**
                                     )
**STEVEN HARPE, Director,**[1]       )
                                     )
          **Respondent.**      )

## OPINION AND ORDER

KeJuantaé Adrien Butler, a self-represented Oklahoma prisoner, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He challenges the lawfulness of his custody under the judgment entered against him, in Tulsa County District Court Case No. CF-2019-363, after a jury found him guilty of three counts of sexually abusing a child under the age of twelve. He contends that he is in custody in violation of his Sixth Amendment right to counsel, his Fourteenth Amendment right to due process, and the Eighth Amendment's prohibition against cruel and unusual punishment because: the State of Oklahoma ("the state") did not present sufficient evidence to prove his guilt beyond a reasonable doubt (claim one); the trial court admitted improper opinion testimony (claim two); the trial court did not give an unrequested jury instruction (claim three); trial counsel provided constitutionally deficient representation by failing to object to the improper opinion testimony and failing to request the omitted jury instruction (claim four); and the trial court imposed a sentence that is disproportionate to his crimes (claim five).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d) and Rule 2(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, the Court substitutes Steven Harpe, Director of the Oklahoma Department of Corrections, in place of Scott Crow, the ODOC's former director, as party respondent. The Clerk of Court shall note on the record this substitution.

The Court has carefully considered the petition (Dkt. # 1), the response in opposition to the petition (Dkt. # 5), and the reply (Dkt. # 10); the record of state court proceedings (Dkt. ## 5-1 through 5-5, 6, 7); and applicable law. The Court finds and concludes that 28 U.S.C. § 2254(d) bars relief as to all claims and that the petition shall be denied.

## I.    Background

Following an investigation, the state charged Butler with one count of sexually abusing his six-year-old stepdaughter, A.K., in violation of OKLA. STAT. tit. 21, § 843.5(F), and alleged that Butler abused A.K. "by touching her on and/or in [her] vagina with his hand." Dkt. # 6-11, O.R., at 18 [13]. Based on A.K.'s testimony at the preliminary hearing, the state amended the charges to add two more counts of child sexual abuse, and, in each count, the state alleged that Butler abused A.K. "by putting his penis on and/or in her vagina." Id. at 31 [26]; see Dkt. # 6-1, Tr. Prelim. Hr'g, at 46-47. Butler's case proceeded to a jury trial on the amended charges. Dkt. # 6-6, Tr. Trial vol. 1, at 7. The following facts were developed at trial.

In 2018, six-year-old A.K. lived in Tulsa with Butler, her mother ("M.B." or "Mother"), and three younger siblings. Dkt. # 6-7, Tr. Trial vol. 2, at 95-97 [335-37].[2] One Sunday morning, in November 2018, A.K. told Butler that she had blood in her underwear. Id. at 99 [339]. Butler consulted Mother, who was at work, and they agreed to schedule an appointment with A.K.'s primary care physician, Dr. Mackenzie Jenkinson. Id. at 99-100 [339-40], 154-55 [394-95]; Dkt. # 7 (State's Ex. 5). When Mother returned home from work, she did not check A.K. for any injuries or to see if she was bleeding. Dkt. # 6-7, Tr. Trial vol. 2, at 139-40 [379-80].

---

[2] The Court's citations generally refer to the CM/ECF header pagination. Citations to transcripts of state court proceedings (e.g., "Tr. Trial") or the original state court record ("O.R."), also include, in brackets, the original page numbers if those numbers differ from the CM/ECF header pagination.

Two days later, Mother took A.K. to see Dr. Jenkinson. Id. at 156-57 [397-98]. According to Dr. Jenkinson, Mother's stated concerns were: that A.K. had blood in her underwear; that A.K. had a rash in her genital area for three to four days, possibly caused by poor bathroom hygiene; that Mother and Butler had been treating the rash with "some creams"; and that Butler saw a possible "cut" in A.K.'s genital area when she was bathing, and Butler thought that she should be seen by a doctor. Id. at 157 [397]. In response to questions posed to A.K. before a physical examination, A.K. told Dr. Jenkinson that she had seen blood in the toilet; that it hurt to urinate and defecate; and that "she and Dad washed down there and that included washing inside her vaginal area in the bathtub."[3] Id. at 158 [398]. Dr. Jenkinson specifically asked A.K. "if anyone washes her genital area" and "does anyone stick fingers inside the vaginal area," and A.K. responded "yes" to both questions. Id. at 164 [404]. Dr. Jenkinson examined A.K.'s genital area and observed "redness and irritation" but not "a lot of significant rash," watery discharge, and "an injury to her vaginal opening that appeared to be a tear towards her perineum," or "the area of skin between the vaginal opening and the anus." Id. at 158-60 [396-400], 163 [403]. Dr. Jenkinson testified that "these types of tears" are often seen in cases of "penetrating trauma, which can lead to concerns of sexual abuse." Id. at 160 [400]. She also testified that while the tear was "unusual," it could have been caused by something other than sexual abuse. Id. at 165-66 [405-06]. After consultation with a pediatric gynecologist and Dr. Mike Baxter, the latter of whom Dr. Jenkinson identified as "the on-call child abuse pediatrician," Dr. Jenkinson contacted the Tulsa Police Department to facilitate a sexual assault examination for A.K. and made a referral to the

---

[3] Throughout the trial, A.K. referred to her vagina as her "coo-coo." Dkt. # 6-7, Tr. Trial, at 35 [275]. The quoted statement regarding Butler "washing inside [A.K.'s] vaginal area" is from Dr. Jenkinson's testimony about the history she obtained from A.K. This statement is not a verbatim response that Dr. Jenkinson obtained from A.K.

Department of Human Services ("DHS").  Id. at 160-61 [400-01].  Dr. Jenkinson told Mother that she had contacted the police and made a referral to DHS.  Id.

Later that same day, A.K.'s grandmother ("K.P." or "Grandmother") was on her way to Mother and Butler's house to babysit the children when Mother called Grandmother and told her that A.K. needed to go to the doctor.  Id. at 83-86 [323-26], 89 [329].  Mother did not tell Grandmother about any DHS or law enforcement involvement.  Id. at 89 [329].  When Grandmother arrived at Mother and Butler's house, Mother had already left for work, and Butler was home with all four children and two police officers.  Id.  Grandmother took A.K. to Hillcrest Hospital for an examination.  Id. at 83-86 [323-26].  Lynn Galloway, a sexual assault nurse examiner, obtained limited information from Grandmother and A.K.  Id. at 169-75 [409-15].  A.K. told Galloway that she did not know why she was there.  Id. at 174 [414], 195 [435].  Grandmother told Galloway that A.K. told Grandmother, during the drive to the hospital, that she had blood in her panties and did not know why she was bleeding.  Id. at 174-75 [414-15], 195 [435].  Grandmother also told Galloway that Butler had asked Grandmother to take A.K. with for an examination.  Id. at 174-75 [414-15].  Galloway observed no injuries to A.K.'s external genitalia or anus; observed areas of redness and "some off-white frothy fluid" in the vestibule, or the "area where the urethra comes out"; and observed a "tear that extended into the perineum towards the anus and then up through the posterior fourchette."  Id. at 176-79 [416-19], 186-97 [426-37].  Galloway described the tear as "quite extensive" and one typically seen with "blunt force trauma." Id. at 178-79 [418-19], 182 [422].  Galloway also noted that A.K.'s hymenal tissue had a "distinct Y impression" rather than "the pinpoint dark area that usually indicates where the hymen will actually start to open."  Id. at 180 [420].  Galloway testified that the Y-shape was unusual but not necessarily indicative of injury.  Id. at 192 [432], 196-97 [436-37].  Galloway did not see any

injuries that were consistent with a "straddle injury," or an injury that might occur "where the legs go on either side of a beam or something." Id. at 181 [421]. Galloway collected swabs during the examination and gave the sealed examination "kit" to the police officer who accompanied Grandmother and A.K. to the hospital. Id. at 183-85 [423-25]; Dkt. # 6-8, Tr. Trial vol. 3, at 3-5 [471-73].

The next day, Mother took A.K. to the Child Advocacy Center to meet with a forensic interviewer. Dkt. # 6-7, Tr. Trial vol. 2, at 105 [345].[4] After the interview, Dr. Baxter physically examined A.K. at the Child Abuse Pediatric Clinic, a clinic located within the Child Advocacy Center. Dkt. # 6-8, Tr. Trial vol. 3, at 9 [477]. Dr. Baxter diagnosed child sexual abuse based on information he received from "several sources" about A.K.'s medical and social history and observations he made when he examined A.K. Id. at 10-12 [478-80], 17-20 [485-88]. Dr. Baxter spoke with Dr. Jenkinson and Nurse Galloway before the examination and testified that he learned that A.K. "had been found to have injuries to her genitalia," "a tear through" her hymenal tissue that "continued on through other tissue called fossa navicularis" and "[a]ll the way basically to the anal opening," and "some initial active bleeding and then some evidence of clotting." Id. at 17-18

---

[4] A.K.'s videotaped forensic interview was not admitted at trial and the forensic interviewer did not testify. It is unclear whether A.K. disclosed any sexual abuse during the forensic interview. The probable cause affidavit submitted with the original charging document states that A.K. stated during the interview that Butler "bathes her and washed her CooCoo (vagina) with soap and a wash cloth," that he "washes her and it hurts," and that he "puts soap on his hands and washes the inside of her CooCoo" and "she can feel it and it hurts." Dkt. # 6-11, O.R., at 21 [16]. During a pretrial reliability hearing, the forensic interviewer, Ali Kern, testified that she had not reviewed A.K.'s videotaped interview for some time and that she did not recall the specifics of any disclosures. Dkt. # 6-5, Tr. Reliability Hr'g, at 112-13. The prosecutor told the trial court at that hearing that the state did not intend to present the videotaped interview at trial because A.K. disclosed no abuse. Id. at 114. The prosecutor also represented in opening statements at trial that A.K. did not disclose any abuse during the interview. Dkt. # 6-7, Tr. Trial vol. 2, at 20 [260]. Later, during a bench conference, the prosecutor stated that A.K. "didn't make a disclosure of abuse, but she did talk about [Butler] washing her." Dkt. # 6-8, Tr. Trial vol. 3, at 24 [492].

[485-86].  Dr. Baxter testified that he received "additional history" from Mother who "reported that the dad figure had been watching her on a Sunday and reported that she had had some bleeding after a bath," and that A.K. went to the doctor and that A.K. "said that Dad had been washing her and putting his fingers inside of her to cause her injuries."  Id. at 18 [486].  Dr. Baxter observed "a full laceration" of the hymenal tissue and "a continued superficial laceration" extending to the anal opening and noted that "various levels of healing through all those different tissues."  Id. at 18-19 [486-87], 28 [496], 30-31 [498-99].  Dr. Baxter described these injuries as "significant," "severe," and "consistent with a penetrating trauma," and testified that most children who are sexually abused "have completely normal physical exam findings."  Id. at 19 [487], 31 [499].  On cross-examination, Dr. Baxter testified that he spoke with the forensic examiner and obtained information that Butler digitally penetrated A.K., but he also testified he did not view the videotaped interview.  Id. at 22-23 [490-91].  Dr. Baxter also testified that A.K. told him only "that it had been difficult to urinate or [that she had] pain with urination for the past few days."  Id. at 25 [493].  According to Dr. Baxter, "Dr. Jenkinson had also reported to [Baxter] that A.K. had told [Dr. Jenkinson] that Dad had hit her in the privates and washed her privates with his fingers in there."  Id. at 25-26 [493-94].  Dr. Baxter further testified that "Mom reported to [him] a similar history that A.K. had disclosed to her about the fingers going into her private area by Dad."  Id. at 26 [494].  Trial counsel then elicited testimony from Dr. Baxter that his examination report mentioned only that Mother reported that A.K. had blood in her genital area after a bath and that Mother never mentioned digital penetration.  Id.  Dr. Baxter also testified that the injuries he observed were not consistent with washing the genital area with soap and a wash cloth and testified that "[i]t would have to be a penetrative trauma to cause" the injuries.  Id. at 27 [495].  Defense counsel then asked, "And that's why your finding was child sexual abuse because you thought that

6

there was already an allegation or already a disclosure that he had put his fingers inside of her?" Id. at 27-28 [495-96].  In response, Dr. Baxter stated, "My diagnosis of child sexual abuse was because she had physical exam findings consistent with penetrative trauma and that there was additional history of genital contact by Dad." Id. at 28 [496].  He further testified that "the medical literature is pretty clear that penetrative trauma would be consistent with sexual abuse in the absence of a known accidental penetrative cause." Id. at 29 [497].  Dr. Baxter testified that he recommended "trauma-focused therapy" for A.K. Id. at 29-30 [497-98].

Detective Mark Kraft, a detective with the Child Crisis Unit, and a DHS worker met with Butler in mid-November 2018 at the Child Advocacy Center for a noncustodial, videotaped interview. Id. at 40-43 [508-11]; Dkt. # 7 (State's Ex. 5).  The videotaped interview was admitted at trial and published to the jury.  Dkt. # 6-8, Tr. Trial vol. 3, at 44-51 [509-19].  During the interview, Butler stated that he was feeding A.K. and her siblings on Sunday morning when he noticed an "odor," so he told A.K. to run a bath when she finished eating.  Dkt. # 7 (State's Ex. 5).  A.K. told Butler that she had blood in her underwear, so he contacted Mother to see what to do, and they agreed to make an appointment for A.K. Id.  Butler stated that while A.K. was in the bathtub, Butler saw that A.K. had a cut on her genitals, but he did not touch her genitals. Id.  Butler stated that he did not know how A.K. was injured. Id.  Butler denied intentionally or accidentally touching A.K.'s genitals with his fingers or having ever used his bare hands to wash her genitals. Id.  He stated that A.K. and her sisters had a history of rashes that Butler and Mother believed were caused by poor bathroom hygiene, but he admitted that they had not taken A.K. to the doctor for the rashes. Id.  He also stated that he had previously discussed with A.K. the importance of not allowing anyone to touch her privates and the importance of not talking to anyone about her

privates unless she had to tell him or Mother that she was hurt.  Id.  Butler agreed to consent to a DNA swab of his cheek and stated that his DNA should not be found in or on A.K.'s genitals.  Id.

In early December 2018, A.K. began weekly trauma therapy sessions with Kellye Baggett, a DHS employee.[5]  Dkt. # 6-7, Tr. Trial vol. 2, at 200-05 [440-45].  After five or six sessions, A.K. made a disclosure to Baggett.  Id. at 207 [447].  While the two were playing a game with "feelings words," the word "angry" came up, so Baggett asked A.K. what makes her angry.  Id. at 207-08 [447-48].  A.K. responded, "when my daddy does the icky, wicky, gooey, zoopey, sloppy stuff." Id. at 208 [448].  Based on her training and experience, Baggett suspected that A.K. was referring to sexual abuse.  Id. at 209 [449], 212 [452], 221-22 [461-62].  To confirm that suspicion, Baggett immediately asked A.K., "[D]o you mean the sexual abuse?"  Id. at 222 [462].  A.K. then responded, "Yes."  Id.  Baggett testified that during that same session and in prior sessions she and A.K. "had been discussing . . . what sexual abuse is, and labeled it as this is sexual abuse, this is sexual abuse, this is sexual abuse."  Id.  Baggett also testified that during therapy sessions she and A.K. would read books about sexual abuse, look at "cartoon pictures" depicting male and female genitalia, and talk about bad touches.  Id. at 210-12 [450-52]; see also id. at 223 [463] ("We were talking in general that if somebody touches your private body parts, that's sexual abuse.").  Baggett testified that she would provide positive reinforcement, including hugs, when A.K. made disclosures, but also testified that A.K. did not appear to seek positive reinforcement "any more so than other kids her age typically do."  Id. at 214 [454], 216 [456].

In late January 2019, Grandmother was babysitting A.K. and her siblings while Mother was at work.  Id. at 86 [326].  A.K. was working on homework with Grandmother, and A.K.'s

---

[5] Baggett testified that she was not a licensed social worker when she had therapy sessions with A.K., and that she received a provisional license in May 2019 and a full license in July 2019. Dkt. # 6-7, Tr. Trial vol. 2, at 202 [442], 209 [449].

siblings were napping. Id. Grandmother testified that A.K. was crying, so she asked A.K. what was wrong. Id. A.K. told Grandmother that she was upset, that she wanted to talk to Mother "about what had happened with" Butler, and that "she was afraid to." Id. Grandmother told A.K. that she was safe, that she would not get into trouble, and that she could talk to Grandmother if she wanted to do so. Id. at 87 [327]. Grandmother testified that A.K. disclosed "that he had touched her"; that "he had come upstairs that night and had woke her up and took her into the bathroom and used a scarf that she would wear on her hair at night to put – tie her mouth up with it so she wouldn't cry"; that he "had her get down on her hands and knees on the bathroom floor"; and that "it happened often."[6] Id. Grandmother testified that A.K. was "crying and upset" when she disclosed this information and that A.K. "seemed like she was relieved" after the disclosure. Id. at 87-88 [327-28]. On cross-examination, Grandmother testified that she assumed A.K.'s discussion of "that night" referred to the Saturday night before the Sunday morning that A.K. told Butler about blood in her underwear. Id. at 92-93 [332-33].

Mother testified that she and Butler routinely worked different shifts so that one of them would be home with the children. Id. at 97 [337]. When they had to work the same shift, Grandmother, Mother's sister, or Butler's mother would care for the children. Id. at 97 [337], 138 [378]. Mother testified that when A.K. was six years old she was bathing herself and that Mother was not aware that Butler was helping A.K. with bath time. Id. at 98 [338]. Mother also testified that she trusted Butler to watch, bathe, and feed the children and to put them to bed. Id. at 135 [375]. Mother learned about A.K.'s injury when she met with DHS in early November 2018 to develop a safety plan. Id. at 106 [346]. At that time, Butler was staying at his mother's home. Id.

---

[6] These quoted statements are from Grandmother's testimony; they are not A.K.'s verbatim statements to Grandmother.

Mother initially did not believe that Butler sexually abused A.K.  Id. at 107 [347].  Mother understood from her meeting with DHS that Butler could have supervised visits with the children, in Mother's home, so long as Mother or Grandmother was present, and she allowed Butler to visit the children until DHS started a "second investigation" in mid-January 2019 and threatened to remove all the children Mother's home.  Id. at 108-10 [348-50], 140 [380].  At that point, A.K. was in therapy, but had not disclosed any sexual abuse to Mother.  Id. at 113 [353].  Near the end of January, A.K. disclosed to Mother.  Id.  Mother testified that Grandmother called her at work, told her that A.K. had disclosed to Grandmother, and told her that A.K. was "ready to disclose" to Mother.  Id. at 114 [354].  Mother got home from work around midnight, got A.K. out of bed and brought her downstairs, and asked A.K. what happened.  Id.  Mother testified that she "confirmed" that A.K. disclosed to Grandmother but testified that she did not ask about or know the details of A.K.'s disclosure to Grandmother.  Id. at 114-16 [354-56], 141 [381].  Mother also testified that she recorded A.K.'s disclosure on her phone and that A.K. was "very nervous" when she disclosed to Mother.  Id. at 114-16 [354-56].[7]  Mother testified that in November 2018, she kept a bottle of hydrogen peroxide in the bathroom, that she kept "a black dildo" that vibrates at different speeds

---

[7] Defense counsel objected when Mother testified that she recorded A.K.'s disclosure on her phone, and the trial court sustained that objection but did not admonish the jury to disregard the testimony.  Dkt. # 6-7, Tr. Trial vol. 2, at 115 [355].  Defense counsel also objected when the prosecutor's next question was whether A.K. knew that she was being recorded, and the trial court sustained that objection as well.  Id. at 115-16 [355-56].  Pursuant to a pretrial ruling, the audio recording of A.K.'s disclosure to Mother was not admitted at trial and Mother was not permitted to testify about the specific details of A.K.'s disclosure to Mother.  Dkt. # 6-6, Tr. Trial vol. 1, at 229-32.  In making its ruling to exclude the recording and Mother's testimony about A.K.'s disclosure, the trial court described the recording as "very unusual" and "extremely unique" and stated, "I feel very uncomfortable about it as far as its reliability.  Because you've got a little girl and then you hear the siblings in the background."  Id. at 229.  The trial court further stated, "[Mother] was recording the disclosure that happened after a disclosure to Grandma and after they set up this little whatever it was in whatever room with all the family present.  And then [Mother] even said at one point, 'You're doing good, you're doing good, let's keep going.'"  Id. at 230.

in a bag in the closet she shared with Butler, and that only she and Butler knew where that bag was hidden. Id. at 114 [354], 141 [381], 148-49 [388-89]. Mother also testified, over Butler's objection, about the content of some emails that she received from Butler. Id. at 117-18 [356-58], 121-34 [362-374]; see also Dkt. # 7 (State's Ex. 3). In two separate emails, both dated on the last day of January 2019, Butler stated that he did not "know what happened" with A.K., that he did not "remember touching her in that manner," and that there might be "something psychologically wrong" with him if he could not remember that. Dkt. # 6-7, Tr. Trial vol. 2, at 132-33 [372-73]. He also stated in one email that there was "something" he had been dealing with "since [he] was little," "[s]omething [he] thought [he] could control," that his family members "have not told the truth about who [he is]," and that he "believe[s] this is the reason [he does not] remember hurting people or people hurting [him]." Id. at 133 [373]. In emails dated February 1, 2019, Butler stated he was "not good enough for anyone," that he would be "praying and begging for [Mother's] forgiveness for everything that [he] ha[s] ever done to [Mother]," and, after apparent references to physical abuse he suffered as a child, stated that he "built a defense of blocking out everything so [his] brain trained itself to lose a lot of things" and that that there is "another dark side of [his] life" that Mother did not know about. Id. at 134 [374]. On cross-examination, Mother testified that Butler did not admit sexually abusing A.K. in any of his emails and that he instead stated that he "didn't do it" and that he thought "they coerced [A.K.] to say [he] did" because "they automatically pointed at [him]" after A.K.'s appointment with Dr. Jenkinson. Id. at 144 [384], 153 [393]. Mother could not recall many details of her conversations with Dr. Jenkinson, police officers, or DHS workers, and she testified that she continued to profess her love for Butler in emails that she sent to him even after A.K. disclosed sexual abuse to Mother. Id. at 136-39 [376-79], 147-48 [387-88], 152-53 [392-93].

A.K., who was seven years old at the time of trial, testified that she understood the difference between the truth and a lie and that the truth means things that really happened.  Id. at 30-31 [270-71].  With the aid of anatomical diagrams, A.K. testified that Butler touched her vagina with his penis "[m]ore than one time," that she sometimes felt his penis "inside" or "maybe inside," and that "it hurts really badly when he does it."[8]  Id. at 34-39 [274-79], 65-67 [305-07], 72-76 [312-16].[9]  A.K. testified that this occurred in her parents' room, in the room she shared with her sisters, in the bathroom, "and sometimes on the floor."  Id. at 39 [279].  At the end of A.K.'s direct examination, the prosecutor asked A.K. if she could explain what she meant about being on the floor.  Id. at 52 [292].  A.K. testified, "He actually done it on the floor, and that's what I mean.  And he actually done it once."  Id.  She testified this occurred in her room and, after testifying that she could not describe her body position while sitting in a chair, A.K. left the witness stand to demonstrate to the jury that she was on the floor "on her elbows and knees with her buttocks raised."  Id. at 52-53 [292-93].  A.K. further testified that while she was in this position, Butler was behind her and his penis "was actually on the inside."  Id. at 53-54 [293-94].  She also testified that when she was on her hands and knees, she was not sure or did not know what it was that she felt on her vagina.  Id. at 69 [309], 72 [312].  She testified that she did not know if Butler touched

---

[8] Given A.K.'s age and the nature of Butler's crimes, A.K.'s testimony includes references to "coo-coo" (her word for vagina), and the generic terms "boy part," or "boy parts," and "front part" (because she did not know a name for penis).  See Dkt. # 6-7, Tr. Trial vol. 2, at 35-37 [275-77], 60 [300] (A.K.'s testimony naming body parts); Dkt. # 7 (State's Exs. 1, 2 (diagrams)).  In this opinion, the Court uses anatomically correct nomenclature when the correct term is clear from the context of A.K.'s testimony and uses A.K.'s terms if the context is unclear or if the use of those terms is necessary to the analysis of Butler's claims.

[9] When the prosecutor asked A.K, "has anyone ever touched you on your coo-coo or your butt," A.K. identified Butler as the "only one that touched it."  Dkt. # 6-7, Tr. Trial vol. 2, at 37-38 [277-78].  A.K. later testified that Butler was not the only one who touched her vagina because Mother and Grandmother sometimes help her clean up.  Id. at 62-63 [302-303].

her vagina or her buttocks with his hand. <u>Id.</u> at 73 [313]. A.K. testified that when Butler "does it," she would have her shirt on and her pants and underwear off. <u>Id.</u> at 40 [280]. A.K. did not see Butler's penis and did not know whether Butler's clothes were off because "he put the blanket over [her] head where [she] can't see." <u>Id.</u> at 40-41 [280-81], 61 [301]. A.K. described one blanket as "black, and it had this other color" but it was not "a rainbow regular cover." <u>Id.</u> at 40-41 [280-81]. In her room and the bathroom, "a different blanket" was on her head—a blanket with "owls and leaves and some trees." <u>Id.</u> at 41-44 [281-84]. She was not sure if she pulled the blankets over her head or if Butler put the blankets on her head. <u>Id.</u> at 74 [414]. A.K. testified that one time in her parents' room, Butler touched her butt with something that "feels like a Taser that was doing it because [she] heard the buzzing." <u>Id.</u> at 44-45 [284-85]. A.K. testified that "[i]t actually hurted" when she heard the buzzing and that she had to be quiet because Butler did not want her to "make a noise." <u>Id.</u> at 45 [285]. On cross-examination, A.K. maintained that she thought the buzzing sound was from a taser but testified that she saw nothing in Butler's hand that would cause a buzzing noise and that she does not know what a taser is. <u>Id.</u> at 66-67 [306-11]. She also testified that Butler told her not to tell Mother about him touching her vagina, or A.K. and Butler "would have a fight." <u>Id.</u> at 45-46 [285-86]. A.K. testified that Butler's penis made her vagina bleed, and that she bled "more than one time." <u>Id.</u> at 47-48 [287-88], 67 [307]. She testified that when she was bleeding, Butler "actually put some stuff on it, and he put [her] in the bathtub to make it stop bleeding." <u>Id.</u> at 48-49 [288-89]. A.K. described the "stuff" as something from "a brown bottle" with "a plus on it" and a "white" lid that "look[ed] like water, but it wasn't water," and she testified that "[i]t actually hurted" and "burned." <u>Id.</u> at 48-49 [288-89], 70 [310]. When defense counsel asked if it was a bad touch when Butler put the substance from the brown bottle on A.K., A.K. testified, "I'm just saying it hurts, but it very hurts and it's a bad touch." <u>Id.</u> at 64 [304]. A.K.

testified that Butler washed her vagina, "maybe inside," and her butt, and that she had to go to the doctor. Id. at 49 [289], 67 [307]. She testified that she cried when Butler cleaned her because it hurt, and she did not want him to do it, but she did not know if that was the time that Butler told her to be quiet. Id. at 64 [304]. She testified that she did not have a blanket on her head in the bathtub because "blankets can't get wet." Id. at 69-70 [309-10]. A.K. testified that she was afraid to tell anyone what happened, that her therapist helped her learn "cookie breathing" to "calm down" and that she eventually told her therapist, Grandmother, and Mother what Butler did. Id. at 50-51 [290-91], 68 [308]. On cross-examination, A.K. testified that she did not read books about bad touches with her therapist and that they only read "books about stories and the cookie breathing and stuff." Id. at 59-60 [299-300]. She testified that she "just know[s] that [her] coo-coo and the butt is a bad place to touch." Id. at 60 [300]. A.K. testified that she sometimes wiped incorrectly after going to the bathroom and sometimes gets itchy, but she did not remember getting rashes or having diaper cream applied by Mother or Butler and she denied ever scratching hard enough to cut herself. Id. at 57-58 [297-98], 62-63 [302-03].

Detective Kraft testified that he was aware, before Butler's interview, that A.K. had made statements about Butler washing A.K.'s privates in the bathtub and that when Kraft signed an affidavit in January 2019 there had been no allegations from A.K. regarding penile penetration. Dkt. # 6-8, Tr. Trial vol. 3, at 54-56 [522-24]. Kraft further testified that A.K. first alleged penile penetration at the preliminary hearing, and that no further investigation was done based on A.K.'s new disclosures. Id. Kraft also testified that no DNA was found during A.K.'s sexual assault examination. Id.

After both parties rested, the state moved to amend the charges to allege, as to all three counts, that Butler committed child sexual abuse "by putting his penis and/or his hand and/or a

14

vibrator on and/or in [A.K.'s] vagina and/or anus." Dkt. # 6-8, Tr. Trial vol. 3, at 65-66 [533-34]. After hearing oral arguments, and over Butler's objection to the timing of the amendments, the trial court permitted the state to amend each count to allege that Butler "put[] his penis and/or his hand on and/or in [A.K.'s] vagina." Id. at 66-89 [534-56]; Dkt. # 6-9, Tr. Trial vol. 4, at 3-7 [561-65]. The jury found Butler guilty of each charge, as amended at the conclusion of the trial, and recommended the statutory minimum prison sentence of twenty-five years as to each conviction. Dkt. # 6-11, O.R., at 107-09 [102-04].[10] The trial court sentenced Butler accordingly and ordered that he serve the sentences consecutively. Dkt. # 6-10, Tr. Sentencing Hr'g, at 7. Through counsel, Butler filed a direct appeal in the Oklahoma Court of Criminal Appeals ("OCCA"), asserting five claims. Dkt. # 5-1, at 2-3. The OCCA rejected each claim on the merits and affirmed Butler's convictions and sentences. Dkt. # 5-3.

In this habeas proceeding, Butler raises the same five claims that he presented to the OCCA. Dkt. # 1, at 4-12; Dkt. # 5, at 16.

## II.    Discussion

A federal court may grant habeas relief to a petitioner in custody pursuant to a state court judgment "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); see also Wilson v. Corcoran, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment

---

[10] Before delivering their verdicts and sentencing recommendations, the jury asked two questions. First, it asked, "Why are there 3 identical counts in this trial? This was never explained to us." Dkt. # 6-11, O.R., at 110 [105]. With the agreement of the parties, the trial court responded, "You have all of the law and evidence necessary to reach a proper verdict." Id.; Dkt. # 6-9, Tr. Trial vol. IV, at 67-68 [625-26]. Second, the jury asked, "If found guilty, are the sentences going to run consecutively or concurrently?" Dkt. # 6-11, O.R., at 111 [106]. With the agreement of the parties, the trial court responded, "This is not for your consideration." Id.; Dkt. # 6-9, Tr. Trial vol. IV, at 69-70 [627-28].

susceptible to collateral attack in the federal courts."). When, as here, the petitioner's federal claims were adjudicated on the merits in state court, a federal court may not grant federal habeas relief unless the petitioner first shows that the state court's adjudication of the claim resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

Section 2254(d)'s standards are demanding. When the state court "identifies the correct governing legal principle in existence at the time of its decision, the only question under § 2254(d)(1) is whether the decision unreasonably applies that principle to the facts of the prisoner's case." Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (citation and internal quotation marks omitted). To establish that the decision resulted from an objectively unreasonable application of the law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). Under § 2254(d)(2), a petitioner must show that the state court decision is based on an unreasonable determination of the facts that were presented in state court. But the reasonableness of a state court's factual determination also is measured by Richter's fairminded-disagreement standard. Dunn v. Madison, 538 U.S. 10, 14 (2017). And the Supreme Court has emphasized that, "if [Richter's] rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision" and that the federal court may not disturb the state court's decision "without identifying—let alone rebutting—all of the justifications" that may support that decision. Mays v. Hines, 592 U.S. 385, 391-92 (2021)

16

(per curiam).  Significantly, the petitioner must make the showings demanded by § 2254(d) based on the same record that was before the state court.  See Pinholster, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); 28 U.S.C. § 2254(d)(2) (requiring petitioner to show that state court's adjudication of federal claim "resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*" (emphasis added)).  Further, the federal court must presume that a state court's factual findings are correct absent clear and convincing evidence otherwise.  28 U.S.C. § 2254(e)(1).  And, while a federal court may expand the record through an evidentiary hearing in some circumstances if the petitioner has made the threshold showings required by § 2254(d), "the standard to expand the state-court record is a stringent one."  Shinn v. Ramirez, 596 U.S. 366, 371 (2022); see 28 U.S.C. § 2254(e)(2).

Even if the petitioner makes the threshold showings necessary to overcome § 2254(d)'s bar to relief, the petitioner is not entitled to federal habeas relief.  Brown v. Davenport, 596 U.S. 118, 134 (2022) ("While AEDPA announced certain new conditions to relief, it did not guarantee relief upon their satisfaction.").  Rather, the federal court still must apply a harmless-error analysis to determine whether habeas relief is warranted.  Id.; see Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (explaining that if the federal court finds a constitutional error on de novo review, the court "must assess [its] prejudicial impact . . . under the 'substantial and injurious effect' standard set forth in Brecht [v. Abrahamson, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness").  Under the Brecht standard, a federal court will grant habeas relief only if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights."  O'Neal v. McAninch, 513 U.S. 432, 445 (1995).

With these standards in mind, the Court turns to Butler's claims.

## A.      Claim one:  insufficient evidence

In claim one, Butler contends that the evidence presented at trial was not sufficient to prove his guilt beyond a reasonable doubt.  Dkt. # 1, at 4, 13-14, 17; Dkt. # 10, at 1-10.  He argues that the evidence was not sufficient because "A.K.'s testimony had many inconsistencies and contradictions," his DNA was not found during A.K.'s sexual assault examination, and "physical evidence and medical testimony confirmed a vaginal injury, but did not offer anything conclusive as to" whether Butler caused that injury.  Id.

### 1.      Clearly established federal law

The Fourteenth Amendment's Due Process Clause guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."  Jackson v. Virginia, 443 U.S. 307, 316 (1979).  Under Jackson, "the relevant question" for a reviewing court "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319 (emphasis in original).  In a habeas proceeding, the federal court must look to state law to identify the essential elements of the offense, "but the minimum amount of evidence that the Due Process clause requires to prove the offense is purely a matter of federal law."  Coleman v. Johnson, 566 U.S. 650, 655 (2012) (per curiam).

And "Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  Johnson, 566 U.S. at 651.  "First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of

insufficient evidence only if no rational trier of fact could have agreed with the jury.'" Id. (quoting

Cavazos v. Smith, 565 U.S. 1 (2011) (per curiam)).  "[S]econd, on habeas review, "a federal court

may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply

because the federal court disagrees with the state court.  The federal court instead may do so only

if the state court decision was 'objectively unreasonable.'"  Id. (quoting Renico v. Lett, 559 U.S.

766, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)).

### 2.    OCCA decision

Applying the Jackson standard, the OCCA concluded that "any rational trier of fact could

find beyond a reasonable doubt that [Butler] sexually abused the victim."  Dkt. # 5-3, at 2.  The

OCCA reasoned:

> The State must show that [Butler] willfully or maliciously engaged in rape, rape by
> instrumentation, or lewd or indecent acts with a child under twelve.  21 O.S. §
> 843.5; OUJI-CR 2d 4-39.  The victim testified in detail that [Butler] touched and
> penetrated her anus and vagina several times.  This testimony was corroborated by
> physical evidence and medical testimony, as well as testimony of the victim's
> disclosures to other people.  The victim consistently named [Butler] as her attacker.
> While there were minor inconsistencies and contradictions in the six-year-old
> victim's testimony, it was neither incredible nor thoroughly impeached.

Id. at 2-3 (footnote omitted).

### 3.    Analysis and conclusion

Butler argues that the OCCA's decision is based on an unreasonable application of the

Jackson standard and an unreasonable determination of the facts presented in state court.  Dkt. #

1, at 13-14; Dkt. # 10, at 2-9.  Respondent contends that Butler has not made either showing and

that § 2254(d) therefore bars relief as to this claim.  Dkt. # 5, at 21-30.

In accordance with state law, Butler's jury was instructed that it could not return a guilty

verdict unless the state proved the following elements beyond a reasonable doubt:  (1) that Butler

willfully or maliciously engaged in; (2) rape and/or rape by instrumentation and/or lewd or

indecent acts; (3) with/to/of a child under the age of twelve.  Dkt. # 6-11, O.R., at 138-46 [133-41] (Jury Instr. Nos. 24 through 29); See OKLA. STAT. tit. 21, § 843.5(F) (2017).  As to the second of these three elements, the jury was further instructed that the state had to prove, beyond a reasonable doubt, one of the three following sets of elements:

> (1) that Butler had sexual intercourse; (2) with a person who was not his spouse; and (3) that Butler was over the age of eighteen and A.K. was under the age of fourteen; OR

> (1) that Butler penetrated, even if slightly; (2) A.K.'s vagina while she was under fourteen years of age; and (3) by using a part of the human body other than the penis; OR

> (1) that Butler knowingly and intentionally: (2) looked upon or touched or mauled or felt; (3) the body or private parts; (4) of A.K. while she was under sixteen years of age; (5) in a lewd or lascivious manner;[11] and (6) Butler was at least three years older than A.K.

Id.  Beyond the elements of the charged crimes, and relevant to Butler's primary complaint about the sufficiency of the evidence, the jury was instructed that it was the jury's "responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness" by considering, among other factors, "the candor, fairness, intelligence, and demeanor of the witness; the ability of the witness to remember and relate past occurrences, the means of observation, and the opportunity of knowing the matters about which the witness has testified." Id. at 128 [123].  In addition, because a "comfort dog" was present in the courtroom for A.K.'s testimony, the jury was instructed that it was "to determine the credibility of a child witness and

---

[11] The jury was instructed that "the words "lewd" and "lascivious" have the same meaning and signify conduct which is lustful and evinces an eagerness for sexual indulgence."  Dkt. # 6-11, O.R., at 146 [141].  The jury also was instructed that "sexual intercourse" means "[t]he actual penetration of the vagina by the penis" and that "[a]ny sexual penetration, however slight, is sufficient to complete the crime of rape."  Id. at 147 [142].

give that testimony such weight and believability as [the jury] deem[s] fit without regard to the dog's presence in the courtroom." Id. at 130 [125].

Having carefully reviewed the trial transcripts and exhibits, the Court concludes that the record does not support Butler's contention that the OCCA's decision is based on an unreasonable application of Jackson. "[F]or a state court's decision to be an unreasonable application of [Supreme Court] law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." Virginia v. LeBlanc, 582 U.S. 91, 94 (2017) (citation and internal quotation marks omitted). Rather, the petitioner must show that the "decision is 'so obviously wrong' that no reasonable judge could arrive at the same conclusion given the facts of the prisoner's case." Frederick v. Quick, 79 F.4th 1090, 1103 (10th Cir. 2023) (quoting Shinn v. Kayer, 592 U.S. 111, 118 (2020) (per curiam)), cert. denied, 144 S. Ct. 2634 (2024). The crux of Butler's argument is that A.K.'s testimony was not credible. Butler is correct that A.K.'s testimony was sometimes inconsistent and that it did not perfectly align with testimony from other witnesses describing A.K.'s disclosures of sexual abuse. See, supra, section I. But evaluating the credibility of A.K.'s testimony was a task committed to the jury and the jury was free to believe or disbelieve any parts of A.K.'s testimony in reaching its verdict. See United States v. Cueto, 628 F.2d 1273, 1275 (10th Cir. 1980) ("A jury may believe a part of a witness' testimony, and disbelieve other parts."). As previously discussed, Johnson clearly describes the roles of the jury, the appellate court, and the federal habeas court in evaluating evidence. The jury determines the weight and credibility of the evidence; the appellate court applies the Jackson standard by viewing the evidence in the light most favorable to the state and upholds a jury's verdict unless "no rational trier of fact could have agreed with the jury"; and the federal habeas court respects the reviewing court's decision that the evidence is sufficient to support the verdict so long as the state court applied the Jackson standard

in an objectively reasonable manner.  Johnson, 566 U.S. at 651.  Butler appears to argue that the OCCA unreasonably applied Jackson because the OCCA "simply defer[red] to the trier of fact's verdict" when the OCCA determined that it was rational for the jury to credit A.K.'s testimony. Dkt. # 10, at 2.  But the Jackson standard requires an appellate court to grant deference to the jury's verdict.  See United States v. Flechs, 98 F. 4th 1235, 1243 (10th Cir. 2024) (noting that an appellate court "owe[s] considerable deference to the jury's verdict" and "defer[s] to the jury's assessment of a witness's credibility" (alterations added) (citation omitted)).  As the Jackson Court explained, an appellate court's task is not to "ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt."  Jackson, 443 U.S. at 318-19 (emphasis in original) (quoting Woodby v. INS, 385 U.S. 276, 282 (1966)).  Instead, by requiring the appellate court to consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the Jackson standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id. at 319 (emphasis in original); see also Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993) (noting that, in assessing the sufficiency of the evidence, an appellate court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason"). Even assuming a rational juror could have disbelieved some parts of A.K.'s testimony, a rational juror could have credited A.K.'s testimony identifying Butler as the person who put his penis in her vagina more than one time, describing the locations in the house where he abused her, describing details related to that abuse including the use of blankets over her head and the position of her body, and describing the pain she felt when his penis was inside her vagina.  Moreover, three medical providers testified that A.K. had an "extensive" and "severe" injury to her vagina

and corresponding bleeding that was atypical for her age, that the injury was typical of injuries seen with penetrative trauma, and that there was no history relayed to, or observations made by, those medical providers suggesting that the injury resulted from some type of fall or accident.  On the record presented, it was objectively reasonable for the OCCA to determine that the jury's resolution of conflicting evidence and the jury's credibility determinations were within the bounds of reason and for the OCCA to further determine, "after viewing the evidence in the light most favorable to the prosecution, [that] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319 (emphasis in original).

The record also does not support Butler's contention that the OCCA's decision is based on an unreasonable determination of the facts presented in state court.  "The standard for determining whether the state court's decision was based on an unreasonable determination of the facts 'is a restrictive one.'"  Frederick, 79 F.4th at 1104 (quoting Grant v. Trammell, 727 F.3d 1006, 1024 (10th Cir. 2013)).  "But 'where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.'"  Ryder ex rel. Ryder v. Warrior, 810 F.3d 724, 739 (10th Cir. 2016) (quoting Byrd v. Workman, 645 F.3d 1159, 1171-72 (10th Cir. 2011)).  The OCCA's decision plainly misapprehends the record in two instances.  First, as Butler argues, the record does not support the OCCA's statement that A.K. testified about repeated penetration of her anus.  See Dkt. # 5-3, at 2-3 ("The victim testified in detail that [Butler] touched and penetrated her anus and vagina several times."); Dkt. # 10, at 2 (asserting that "A.K. never testified her anus was touched and penetrated [and] that was error on OCCA's part").  Rather, A.K. testified that she did not know if Butler ever touched her vagina or buttocks with his hands, that she felt his penis

"inside" or "maybe inside" her vagina, and that one time she felt a "buzzing" thing on (not in) her buttocks.  See, supra, section I.  Second, as Butler argues, the record does not support the OCCA's statement that A.K.'s "testimony was corroborated by . . . testimony of the victim's disclosures to other people."  See Dkt. # 5-3, at 3; Dkt. # 10, at 5-6 (comparing A.K.'s testimony to testimony from other witnesses about A.K.'s disclosures).  The evidence presented at trial shows that A.K. disclosed to Dr. Jenkinson that Butler digitally penetrated her in the bathtub; disclosed to Nurse Galloway that she had unexplained bleeding; disclosed to the forensic interviewer no sexual abuse; disclosed to Dr. Baxter that she had painful urination; disclosed to her therapist that she gets angry when Butler "does the icky, wicky, gooey, zoopey, sloppy stuff"; and disclosed to Grandmother that Butler took her to the bathroom, had her get down on the floor, and tied her mouth shut with a scarf.  See, supra, section I.  A.K. did testify that Butler poured what a rational juror could have inferred was hydrogen peroxide on her vagina in the bathtub to stop her bleeding and to clean her up when she was bleeding.  Arguably, this could be considered as corroborated by her disclosure to Dr. Jenkinson.  But A.K. testified at trial that it was Butler's penis that made her bleed; that Butler covered her head with blankets when he sexually abused her; and that Butler told her to be quiet, not that he tied up her mouth with a scarf.  Nor did she describe at trial any of Butler's conduct using the nonsense words that her therapist understood as a disclosure of sexual abuse.  Nevertheless, the OCCA's misapprehension of the record in these two instances does not render its ultimate decision objectively unreasonable for two reasons.  First, the OCCA's finding that A.K. testified about anal penetration does not go to a material factual issue because none of the jury instructions describing the essential elements of the crimes charged referred to anal penetration.  Dkt. # 6-11, O.R., at 113-14 [108-09], 138-46 [133-41].  Second, the OCCA's finding that A.K.'s testimony was corroborated by testimony about her disclosures to others does not go

to a material factual issue because the question for the OCCA was whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original). And in answering this question, "[a] reviewing court must disregard trial testimony if it finds that the testimony is inherently incredible or impossible on its face." United States v. Pike, 36 F.3d 1011, 1013 (10th Cir. 1994). But, regardless of whether A.K.'s testimony was corroborated by testimony from other witnesses about her pretrial disclosures of sexual abuse, A.K.'s testimony was detailed and, as the OCCA found, was corroborated by physical evidence of injuries typically seen in cases involving penetrative trauma. Her testimony was neither inherently incredible nor facially impossible. Viewing all the evidence in the light most favorable to the state, it was objectively reasonable for the OCCA to determine, on the facts presented at trial, that the evidence was sufficient to support the jury's guilty verdicts.

Based on the foregoing, Butler has not shown that he can satisfy the preconditions to relief in either § 2254(d)(1) or (d)(2). The Court thus finds that § 2254(d) bars relief and denies the petition as to claim one.

### B.    Claim two: improper opinion testimony

Next, Butler claims that the state violated his Fourteenth Amendment right to a fair trial because the trial court admitted improper opinion testimony from Dr. Baxter. Dkt. # 1, at 5, 14-15; Dkt. # 10, at 10-12. Butler argues that "it was error for Dr. Baxter to cite [Butler's] unsubstantiated 'history of genital contact with A.K.' as a basis for his diagnosis [of sexual abuse] during his testimony." Dkt. # 1, at 14-15. Butler further argues that Dr. Baxter effectively "told the jury the conclusion to reach by testifying [that] A.K's injuries were consistent with abuse and Mr. Butler was the source of that abuse." Id. at 15.

25

### 1.     Clearly established federal law

The admission of evidence at a state trial is largely governed by state law.  And whether evidence was improperly admitted under state rules of evidence "is no part of a federal court's habeas review of a state conviction."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Lisenba v. California, 314 U.S. 219, 228 (1941) (noting that federal habeas courts "do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence"); Thornburg v. Mullin, 422 F.3d 1113, 1124 (10th Cir. 2005) (noting that, on federal habeas review, the court's "concern is not whether state rules of evidence were violated" and the court instead "must confine [itself] to 'deciding whether a conviction violated the Constitution, laws, or treaties of the United States'" (quoting McGuire, 502 U.S. at  68)).  Habeas review of state evidentiary rulings is therefore limited to determining whether the admission of the challenged evidence "so infused the trial with unfairness as to deny due process of law."  Lisenba, 314 U.S. at 228.  And, when the state court has already passed on that due process question, a habeas petitioner must show that the state court had no reasonable basis to reject the due process claim.  Richter, 562 U.S. at 98.

### 2.     OCCA decision

On direct appeal, Butler argued that "Dr. Baxter's conclusion overstepped the bounds of a proper expert opinion" during the emphasized portion of the following colloquy with defense counsel on cross-examination:

Q.     Where you got information from is essentially the forensic interviewer?

A.     The forensic interviewer, yes, had relayed that during the bath that Dad would use a wash cloth and put his fingers in her private.

Q.     Did you go – but you never watched [the videotaped interview].  You never heard what A.K. actually had to say?

A.     I did not.

> Q.    Is it consistent with putting soap on a wash cloth and washing the genital area, that injury, would that be consistent?
>
> A.    No, ma'am.  It would have to be a penetrative trauma that caused that.
>
> Q.    And that's why your finding was child sexual abuse because you thought that there was already an allegation or already a disclosure that he had put his fingers inside of her?
>
> A.    My diagnosis of child sexual abuse was because she had physical exam findings consistent with penetrative trauma *and that there was additional history of genital contact by Dad*.

Dkt. # 6-8, Tr. Trial vol. 3, at 27-28 [495-96]; see Dkt. # 5-1, at 28-29.  Butler argued on direct appeal that the italicized testimony "removed the inferential step between the conclusion that A.K.'s injuries were consistent with abuse and that [Butler] was the *source* of that abuse" and therefore "told the jury the conclusion to reach."  Dkt. # 5-1, at 30.

The OCCA found "no plain error in admission of Dr. Baxter's conclusion that the victim had suffered child sexual abuse."  Dkt. # 5-3, at 4.  Relying on state law and several prior OCCA decisions, the OCCA reasoned that "[a]n expert may testify to an opinion that embraces an ultimate issue for the trier of fact" and that it had "consistently held that an expert may testify to a conclusion that a victim suffered abuse or neglect."  Id.   The OCCA further stated:

> [Butler] argues that Baxter's inclusion of [Butler] in his opinion told jurors what result to reach.  "That a proper expert opinion supplies a strong inference of guilt or innocence is no bar to its admissibility."  Ball, ¶ 19, 173 P.3d at 87.  [Butler] invited the reference to himself by specifically asking the doctor about testimony regarding [Butler's] contact with the victim's genitals.  He cannot complain of the error he invited.  Revilla v. State, 1994 OK CR 24, ¶ 20, 877 P.2d 1143, 1150.  Furthermore, Baxter testified that his conclusion would remain the same without that information based on the victim's injury.  The record does not support a conclusion that Baxter's statement told jurors what result to reach.

Dkt. # 5-3, at 4-5.

3.        **Analysis and conclusion**

Respondent contends that claim two alleges an error of state law that is not cognizable on habeas review. Dkt. # 5, at 30-31. Respondent further contends that, if Butler's claim is construed as alleging a federal due process violation, the OCCA reasonably determined that the admission Dr. Baxter's testimony did not deprive Butler of a fundamentally fair trial. Id. at 32-35.

The Court liberally construes claim two as asserting the same claim that Butler presented to the OCCA. Dkt. # 1, at 14-15. But, for two reasons, the Court concludes that Butler is not entitled to federal habeas relief. First, to the extent Butler's claim could be construed as asserting that the OCCA misapplied state law when it found no error in the admission of Dr. Baxter's testimony, the Court agrees with respondent that Butler alleges only an error of state law that is not subject to federal habeas review, see McGuire, 502 U.S. at 67-68; Thornburg, 422 F.3d at 1124. Second, to the extent Butler asserts that the admission of Dr. Baxter's testimony violated his constitutional right to due process, the OCCA effectively determined that Butler was not deprived of due process when it rejected his claim on plain-error review. See Thornburg, 422 F.3d at 1125 (noting that the OCCA's plain-error test is the functional equivalent of the federal due-process test and that when the OCCA reviews a claim for plain error, a federal court "must defer to its ruling unless it 'unreasonably appli[ed]' that test"). And Butler has not presented any argument, much less a persuasive one, to show that the OCCA unreasonably applied the federal due-process test in rejecting his challenge to the admission of Dr. Baxter's opinion testimony. For these reasons, § 2254(d) bars relief and the Court denies the petition as to claim two.

### C.    Claim three:  omitted jury instruction

Butler claims that he was deprived of a fair trial because the trial court did not give an unrequested "jury instruction as to impeachment of A.K. due to incompatible inconsistent statements."  Dkt. # 1, at 6, 15-16; Dkt. # 10, at 6-9.

### 1.    Clearly established federal law

Generally, claims concerning errors arising from jury instructions are considered matters of state law.  Patton v. Mullin, 425 F.3d 788, 807 (10th Cir. 2005).  Thus, "errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law." Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997) (internal quotation marks and citation omitted).  And the burden on a petitioner attacking a state court judgment based on the omission of a jury instruction is heavy because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977). That burden is even heavier when, as here, a petitioner challenges the omission of a jury instruction on direct appeal as a violation of constitutional due process and the state court adjudicates the merits of the petitioner's federal claim.  Richter, 562 U.S. at 98; Thornburg, 422 F.3d at 1125.

### 2.    OCCA decision

The OCCA found "that no evidence supported the giving of an impeachment instruction regarding [A.K.'s] testimony."  Dkt. # 5-3, at 3.  The OCCA also noted that Butler "neither requested this instruction nor objected to the instructions at trial and has waived all but plain error." Id.  The OCCA concluded that no plain error occurred based on the trial court's failure to give an unrequested impeachment instruction because "the instruction was not supported" by the evidence. Id.

### 3.    Analysis and conclusion

By reviewing Butler's jury instruction claim under its plain-error standard, the OCCA effectively determined that Butler was not deprived of due process based on the omission of the unrequested impeachment instruction. Thornburg, 422 F.3d at 1125. Thus, Butler must show that the OCCA's application of the federal due-process test was objectively unreasonable. Id. Butler has not made this showing. He essentially relies on his view that A.K.'s testimony was full of "inconsistencies and contradictions" and argues the omitted instruction was necessary to permit the jury to properly evaluate her testimony. Dkt. # 5, at 15-16. This argument ignores that defense counsel thoroughly examined A.K. regarding what Butler describes as "inconsistencies and contradictions" in her testimony. And, as previously discussed in the analysis of claim one, the jury was instructed that it was the jury's "responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness" by considering, among other factors, "the candor, fairness, intelligence, and demeanor of the witness; the ability of the witness to remember and relate past occurrences, the means of observation, and the opportunity of knowing the matters about which the witness has testified." Dkt. # 6-11, O.R., at 128 [123]. In addition, the jury was instructed that it was "to determine the credibility of a child witness and give that testimony such weight and believability as [the jury] deem[s] fit without regard to the dog's presence in the courtroom." Id. at 130 [125].

Having reviewed the trial transcripts and exhibits and the jury instructions, as a whole, the Court finds that it was objectively reasonable for the OCCA to determine that omission of the unrequested impeachment instruction did not deprive Butler of due process. The Court thus concludes that § 2254(d) bars relief and denies the petition as to claim three.

### D.    Claim four:  ineffective assistance of counsel

Butler claims that he was deprived of his Sixth Amendment right to counsel because trial counsel (1) did not object to the admission of Dr. Baxter's improper opinion testimony or move to strike that testimony and (2) did not request an impeachment instruction regarding A.K.'s testimony.  Dkt. # 1, at 7, 16; Dkt. # 10, at 11-13.

### 1.    Clearly established federal law

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to the assistance of counsel.  U.S. Const. amend. VI; Strickland v. Washington, 466 U.S. 668, 686 (1984).  The Supreme Court has interpreted that right to require the effective assistance of counsel.  Strickland, 466 U.S. at 686; see McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel.").  To prevail on a claim that counsel provided constitutionally deficient assistance, a defendant must show both deficient performance and resulting prejudice.  Id. at 687, 694.  To establish deficient performance, a defendant must show that "counsel's representation fell below an objective standard of reasonableness."  Id. at 687.  To establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

### 2.    OCCA decision

Applying Strickland, the OCCA concluded that trial counsel was not ineffective for failing to request an impeachment instruction or object to Dr. Baxter's testimony because it had previously concluded that "no evidence supported" requesting that instruction and Dr. Baxter's testimony was not improperly admitted.  Dkt. # 5-3, at 6.

31

### 3.      Analysis and conclusion

Butler reasserts his argument that trial counsel performed deficiently and prejudicially for the same reasons he identified on direct appeal.  But he offers no argument to suggest, much less show, that it was objectively unreasonable for the OCCA to reject his <u>Strickland</u> claim based on its prior conclusions (1) that no evidence supported the unrequested impeachment instruction and (2) that the trial court did not erroneously admit Dr. Baxter's opinion testimony.  Even overlooking Butler's failure to address the OCCA's decision or argue why § 2254(d) does not bar relief, the Court finds that the OCCA reasonably applied <u>Strickland</u> to the facts of this case and reasonably determined the facts necessary to its evaluation of the <u>Strickland</u> claim.  Because § 2254(d) bars relief, the Court denies the petition as to claim four.

### E.      Claim five:  disproportionate sentence

Butler claims that his total sentence of seventy-five-years' imprisonment violates the Eighth Amendment.  Dkt. # 1, at 12, 16.  As he did on direct appeal, Butler argues that the seventy-five-year prison sentence, resulting from the trial court's decision to order Butler to consecutively serve his three, twenty-five-year terms, is disproportionate given the facts of his crimes, his lack of any prior criminal history, and his low risk of recidivism.  <u>Id.</u>; Dkt. # 5-1, at 32-34.

### 1.      Clearly established federal law

The Supreme Court has recognized that "in determining whether a particular sentence for a term of years can violate the Eighth Amendment, [it has] not established a clear or consistent path for courts to follow."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 72 (2003).  The only clearly established legal principles are (1) that "[a] gross disproportionality principle is applicable to sentences for terms of years"; and (2) that "the gross disproportionality principle, the precise contours of which are unclear, [is] applicable only in the 'exceedingly rare' and 'extreme' case."

Id. at 72-73.  The United States Court of Appeals for the Tenth Circuit has discussed the rarity of grossly disproportionate sentences, stating,

> Although the Supreme Court has reviewed Eighth Amendment challenges to a number of state and federal sentences, it has struck down only two of them over the past century.  In Weems v. United States, 217 U.S. 349, 367, 30 S. Ct. 544, 54 L. Ed. 793 (1910), the Court invalidated under the Eighth Amendment a sentence of fifteen years in chains and at hard labor, plus permanent surveillance and civil disabilities, for the crime of falsifying a public document.  Seventy-three years later, in Solem v. Helm, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983), the Court invalidated under the Eighth Amendment a sentence of life imprisonment without the possibility of parole imposed under South Dakota law against a nonviolent recidivist whose final crime was writing a "no account" check with the intent to defraud.

United States v. Angelos, 433 F.3d 738, 750 (10th Cir. 2006).  The Angelos court then contrasted these two cases with several more cases involving the Supreme Court's rejection of Eighth Amendment proportionality claims and concluded, "[c]onsidered together, these cases clearly support the Supreme Court's recent statement in Andrade that '[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case.'"  Id. at 751 (quoting Andrade, 538 U.S. at 76).

### 2.     OCCA decision

The OCCA rejected this claim, reasoning:

> An abuse of discretion is any unreasonable or arbitrary action made without proper consideration of the relevant facts and law, also described as a clearly erroneous conclusion and judgment, clearly against the logic and effect of the facts.  State v. Hovet, 2016 OK CR 26, ¶ 4, 387 P.3d 951, 953.  [Butler] received the minimum sentence on each count.  He argues that the cumulative length of his sentences is disproportionate to the offenses.  The trial court was aware, in imposing sentence, that [Butler] had neither a prior criminal record nor a documented history of child abuse or neglect; the court also had the results of [Butler's] Level of Service Inventory regarding his potential for recidivism.  Evidence showed that [Butler] abused his six-year-old stepdaughter for months, causing significant physical injury as well as fear and trauma.  The record does not support a finding that the trial court abused its discretion.

Id.

### 3.      Analysis and conclusion

Respondent urges the Court to deny relief on claim five for three reasons.  The first two are not persuasive.  First, respondent contends that claim five does not present a cognizable habeas claim because "matters pertaining to sentencing are issues of state law."  Dkt. # 5, at 53; see, e.g., Dennis v. Poppel, 222 F.3d 1245, 1258 (10th Cir. 2002) ("Generally, our review of a sentence ends once we determine the sentence is within the limitation set by statute."); Handley v. Page, 398 F.2d 351, 352 (10th Cir. 1968) (noting that the question of whether sentences should be served concurrently or consecutively raised no issue cognizable in federal habeas corpus).  Sentencing claims raised in habeas proceedings often implicate only issues of state law.  However, claim five does not.  As previously discussed, clearly established federal law holds that the Eighth Amendment contains a narrow proportionality principle that applies to noncapital sentences.  See Andrade, 538 U.S. at 72 ("A gross disproportionality principle is applicable to sentences for terms of years.").  Butler argued on direct appeal and reasserts here, that his sentence is disproportionate and violates the Eighth Amendment.  That is sufficient to state a cognizable federal habeas claim.

Second, respondent recognizes the possibility that claim five implicates the Eighth Amendment but contends that Butler's "fleeting reference to the Eighth Amendment and Solem" was not sufficient to alert the OCCA that he was raising a federal claim.  Dkt. # 5, at 54.  As respondent argues, a habeas petitioner must fairly present his federal claim in state court before presenting that claim in federal court through a habeas petition.  See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established

appellate review process."); <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (explaining that a habeas petitioner must "provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim"). But "[a] petitioner need not invoke talismanic language or cite book and verse on the federal constitution. Rather, the crucial inquiry is whether the substance of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." <u>Prendergast v. Clements</u>, 699 F.3d 1182, 1184 (10th Cir. 2012) (internal citations and quotation marks omitted). Butler fairly presented the substance of his federal claim to the OCCA through his references to the Eighth Amendment and <u>Solem</u>, his assertion that his sentence was not only excessive but also "disproportionate," and his identification of facts showing that his sentence is disproportionate.

Respondent's third reason, however, is persuasive. Respondent argues that the facts and circumstances of this case do not support Butler's claims that his sentence is constitutionally disproportionate. Dkt. # 5, at 54-55. Essentially, that is the conclusion that the OCCA reached without expressly discussing the Eighth Amendment's proportionality principle. Dkt. # 5-3, at 5. When, as here, a petitioner has fairly presented the substance of his federal claim in state court and the state court has rejected that claim without discussing federal law, there exists a rebuttable presumption that the state court adjudicated the federal claim on the merits. See <u>Johnson v. Williams</u>, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."). That presumption may be rebutted, for example, if "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court," or "when a defendant does so little to raise his claim that he fails to fairly present it in each appropriate state court." <u>Id.</u> at 302-

03 & n.3.  Butler does not rebut that presumption here.  As discussed, Butler fairly presented his federal claim to the OCCA.  Further, the OCCA adjudicated the merits of that claim by evaluating the facts that Butler identified to support his argument that the punishment was grossly disproportionate.  Dkt. # 5-3, at 5; see Johnson, 586 U.S. at 302 ("A judgment is normally said to have been rendered on the merits only if it was delivered after the court . . . heard and *evaluated* the evidence and the parties' substantive arguments." (internal citations and quotation marks omitted)).

Because the presumption of an adjudication on the merits applies to claim five, Butler must show that the OCCA's decision was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  Butler's arguments in support of claim five focus on the facts without suggesting, much less showing, that the OCCA unreasonably applied clearly established federal law to those facts or unreasonably determined the facts based on the evidence presented in state court.  Dkt. # 1, at 12, 16.  As the OCCA reasoned, the trial court accepted the jury's recommendations that Butler receive the statutory minimum twenty-five-year prison term for each conviction and, in deciding whether to run those terms consecutively, the "trial court was aware . . . that [Butler] had neither a prior criminal record nor a documented history of child abuse or neglect"; the trial "court also had the results of [Butler's] Level of Service Inventory regarding his potential for recidivism"; and the "[e]vidence showed that [Butler] abused his six-year-old stepdaughter for months, causing significant physical injury as well as fear and trauma."  Dkt. # 5-3, at 5.  Even liberally construing the petition as attempting to argue that Butler can overcome § 2254(d)'s bar, the Court concludes that he has not shown that the OCCA's decision rejecting his Eighth Amendment claim is either based on an objectively unreasonable application of clearly established federal law, under which

"[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case," Andrade, 538 U.S. at 76, or is based on an unreasonable determination of the facts presented in state court. Section 2254(d) thus bars relief and the Court denies the petition as to claim five.

## III.    Conclusion

The Court concludes that 28 U.S.C. § 2254(d) bars relief as to each of Butler's constitutional claims.[12] The Court therefore denies the petition. The Court further concludes that reasonable jurists would not debate the Court's assessment of Butler's constitutional claims. The Court therefore declines to issue a certificate of appealability. See 28 U.S.C. § 2253; Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that:

1. the Clerk of Court shall **note** on the record the substitution of Steven Harpe, Director, in place of Scott Crow, as party respondent;

2. Butler's request for an evidentiary hearing is **denied**;

3. the petition for writ of habeas corpus (Dkt. # 1) is **denied**;

4. a certificate of appealability is **denied**; and

5. a separate judgment shall be entered herewith.

**DATED** this 19th day of February, 2025.

_Claire V. Eagan_
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[12] Because §2254(d) bars relief as to all claims, the Court denies Butler's request for an evidentiary hearing. Dkt. # 1, at 10; Dkt. # 10, at 1, 13; see Pinholster, 563 U.S. at 181; 28 U.S.C. § 2254(d)(2).